William A. SCARBOROUGH, Plaintiff,

v.

TRAVELERS INSURANCE CO., et al., Defendants,

and

LAND & MARINE APPLICATORS, INC., Defendant-Appellant,

v.

INSURANCE COMPANY OF NORTH AMERICA, et al., Third-Party Defendants-Appellees.

No. 81–3749.

United States Court of Appeals, Fifth Circuit.

Oct. 31, 1983.

Simon, Peragine, Smith & Redfearn, Daniel J. Caruso, New Orleans, La., for Land & Marine.

Deutsch, Kerrigan & Stiles, A. Wendel Stout, III, Bertrand M. Cass, Jr., Brunswick Deutsch, New Orleans, La., for Ins. Co. of North America.

Robert B. Deane, New Orleans, La., for Lloyd's & Harbor Ins.

Before TUTTLE[*], POLITZ and GARWOOD, Circuit Judges.

GARWOOD, Circuit Judge:

This is an appeal from a summary judgment dismissing appellant's cross-claim against its primary and two excess insurers, upholding the insurers' denial of coverage of a Jones Act claim, based on occupational disease, successfully maintained in the main suit below against appellant by one of appellant's former employees. The principal questions before us are (1) whether an exclusion provision in the primary insurer's policy, requiring that a claim, based on an occupational disease, must be asserted against the insured no later than thirty-six months after the end of the policy period, is void as against the public policy of Louisiana; and if not, then (2) whether LSA–R.S. 22:628, as amended on July 20, 1976, is to be applied "retroactively" so as to validate the

[*] Circuit Judge of the Eleventh Circuit, sitting by designation.

incorporations by reference of this same thirty-six-month exclusion provision into the policies of the excess insurers. We hold that the thirty-six-month exclusion provision is valid and does not contravene the public policy of Louisiana, and that LSA–R.S. 22:628, as amended in 1976, validated the incorporations by reference of this exclusion into the excess policies. We therefore affirm the district court's judgment.

## I.

The material facts are undisputed. William A. Scarborough ("Scarborough"), the original claimant, worked as a sandblaster on offshore drilling platforms from 1959 until May 1967. From October 1963 until May 1967, he was employed by appellant Land & Marine Applicators, Inc. ("Land & Marine").

On August 15, 1977, over ten years after he had left Land & Marine's employ and had ceased working as a sandblaster, Scarborough filed suit under the Jones Act, 46 U.S.C. § 688, and the general maritime law, against his former employers, the owners of the offshore drilling platforms on which he had worked, certain manufacturers of equipment and suppliers of sand used in his sandblasting operations, and these parties' insurers, alleging that he had contracted silicosis as a result of having been exposed to siliceous particles while performing his duties as a sandblaster.

Among those made defendants to Scarborough's referenced suit were appellant Land & Marine and Chevron Oil Company ("Chevron"), the owner of one of the offshore platforms on which Scarborough had worked. Neither Land & Marine's primary insurer, appellee Insurance Company of North America ("INA"), which was providing employers' liability coverage to Land & Marine when Scarborough left Land & Marine's employ in May 1967, nor its excess insurers during the INA policy period, appellees Underwriters at Lloyd's ("Lloyd's") and Harbor Insurance Company ("Harbor"), were made defendants to Scarborough's suit as originally filed.

On November 7, 1977, however, Chevron filed a third-party complaint against Land & Marine, INA, Lloyd's, and Harbor seeking contribution, damages, and indemnity. On December 14, 1977, Scarborough amended his complaint and made INA, Lloyd's, and Harbor defendants.

### A. INA

INA was the workers' compensation and employers' liability carrier for Land & Marine from August 1, 1965 to August 1, 1967. Under Section I of the "INSURING AGREEMENTS" of the INA policy (No. WC 568590) in effect during May 1967 (when Scarborough last worked for Land & Marine), Coverage B, as amended by endorsement, obligated INA to pay on behalf of Land & Marine

"... all sums which the insured shall become legally obligated to pay as damages because of bodily injury by accident or disease ... sustained by any employee of the insured arising out of and in the course of his employment by the insured ...."[1]

Section IV of the insuring agreements further provided that:

"This policy applies only to injury (1) by accident occurring during the policy period, or (2) by disease caused or aggravated by exposure of which the last day of the last exposure, in the employment of insured, to conditions causing the disease occurs during the policy period."

The "EXCLUSIONS" section of the policy provided, in part, that:

"This policy does not apply:

"(e) under coverage B, to bodily injury by disease unless prior to thirty-six months after the end of the policy period written claim is made or suit is brought against the insured for damages because of such injury or death resulting therefrom."

---

1. The endorsement to Coverage B extended coverage to "bodily injury by accident or disease ... sustained by a master or a member of the crew of any vessel" within the territorial limits of the United States and Canada.

It is undisputed that Scarborough's last exposure to siliceous particles occurred while he was employed by Land & Marine and within the INA policy period, which expired on August 1, 1967, and was not renewed. Because Scarborough's claim was not asserted within thirty-six months after the policy period expired, INA denied coverage, and, on April 6, 1978, moved for a summary judgment against Scarborough and Chevron on that basis.

On June 14, 1978, the district court granted INA's motion for summary judgment. Though this judgment initially contained the Fed.R.Civ.Proc. 54(b) finality determinations, that aspect of it was subsequently vacated so it remained interlocutory until September 24, 1981.

Thereafter, on March 6, 1980, Land & Marine filed a cross-claim against INA, Lloyd's, and Harbor seeking indemnity should it be held liable for Scarborough's damages, and for its own attorneys' fees, costs, and expenses.

In January 1981, Scarborough's Jones Act and general maritime law claims were tried to a jury, which found that Land & Marine and three other defendants, who are not parties to this appeal, were liable, jointly and severally, for $650,000 in damages.[2] Thereafter, on March 20, 1981, Land & Marine moved the district court to set aside the outstanding interlocutory summary judgment in favor of INA, on the grounds that (1) enforcement of the thirty-six-month exclusion provision of the INA policy would render that policy vague and ambiguous, and (2) enforcement of the exclusion provision was contrary to public policy.

However, the district court denied Land & Marine's motion, relying on *McMillian v. Coating Specialists, Inc.,* 427 F.Supp. 54 (E.D.La.1976), and *Livingston Parish School Board v. Fireman's Fund American Insurance Company,* 282 So.2d 478 (La.1973), to hold that the thirty-six-month exclusion provision was valid and did not violate public policy.

B. LLOYD'S AND HARBOR

Meanwhile, on January 13, 1981, Lloyd's and Harbor, which provided excess coverage for Land & Marine during the time period covered by the INA policy (August 1, 1965—August 1, 1967), had jointly moved for summary judgment against Land & Marine based on the thirty-six-month exclusion provision of the INA policy, which had been incorporated by reference into both the Lloyd's and the Harbor excess policies.

Neither Land & Marine nor Lloyd's could locate the Lloyd's policies issued to Land & Marine. Instead, the cover notes, which evidenced the issuance of these policies, were relied upon to show the policy terms. The terms of Cover Note JHB 5127 provided, in part, as follows:

"1. This insurance, subject to the terms, conditions and limitations hereinafter mentioned, is to indemnify Land and Marine Applicators, Inc. (hereinafter called 'the Employer') in the manner following namely:

"For claims arising out of their operations in accordance with the terms and conditions of Coverage B including Maritime Coverage of the underlying Policy/Policies No. WC 568590 (or renewals

2. Before the case was submitted to the jury, various defendants were dismissed by an instructed verdict, leaving only Land & Marine, Pulmonson Safety Corporation, Clemco, Inc., and Coating Specialists, Inc. as defendants. The jury found that Scarborough's former employers, Land & Marine and Coating Specialists, were liable based on their negligence and the unseaworthiness of their respective vessels. Pulmonson and Clemco were held liable based on their negligence and the defective design, manufacture, and sale of their products. Liability was apportioned among the defendants as follows:

| Land & Marine | 24% |
| Coating Specialists | 36% |
| Pulmonson | 17% |
| Clemco | 23% |

The jury awarded Scarborough maintenance and cure against Land & Marine and Coating Specialists, but these awards were disallowed by the district court. Thus, Land & Marine's share of the damages was $156,000.

The only appeals before us in this case are those of Land & Marine from the judgments for INA, Lloyd's, and Harbor in Land & Marine's claims against them.

or replacements thereof) issued to the Employer by Insurance Company of North America (hereinafter called 'the Primary Insurers').

"2. Liability shall attach to the Underwriters [Lloyd's] only after the Primary Insurers have paid or have been held liable to pay the full amount of their respective ultimate net loss liability as follows:

" . . . .

"(b) As regards Maritime Coverage only:

"$25,000. ultimate net loss in respect of each person and subject to that same limit each person.

"$25,000. ultimate net loss in respect of each accident.

"(all hereinafter referred to as 'the Primary Limit or Limits') and the Underwriters shall then be liable to pay only such additional amount or amounts as will provide the Employer with a total coverage under the Policy or Policies of the Primary Insurers and this insurance combined of:

" . . . .

"(b) As regards Maritime Coverage only:

"$75,000. ultimate net loss in respect of each person and subject to that same limit each person.

"$175,000. ultimate net loss in respect of each accident.

" . . . .

"7. Liability to pay under this insurance shall not attach unless and until the Primary Insurers shall have admitted liability for the Primary Limit or Limits or unless and until the Employer has by final judgment been adjudged to pay an amount which exceeds such Primary Limit or Limits and then only after the Primary Insurers have paid or have been held liable to pay the full amount of the Primary Limit or Limits.

"8. This insurance is subject to the same warranties, terms, and conditions . . . as are contained in or as may be added to the said Policy/Policies of the Primary Insurers."

The terms of Cover Note JHB 5128, which evidenced additional excess maritime coverage of $25,000 (from $75,000 to $100,-000) for each person and of $125,000 (from $175,000 to $300,000) per accident, did not differ from those of Cover Note JHB 5127 in any material respect.[3]

The umbrella policy, issued by Harbor to Land & Marine, provided excess coverage from $100,000 to $1,000,000 for each occurrence. This policy provided as follows:

| | |
|---|---|
| Edinburgh Assurance Co., Ltd. | 9.48% |
| Andrew Weir Insurance Co., Ltd. | 4.74% |
| Turegum Insurance Co. | 4.74% |
| London & Edinburgh Insurance Co., Ltd. | 2.37% |
| | 66.36% |

The cover notes evidencing the coverage provided by the above-named companies stated: "It is understood and agreed that this Cover Note shall run concurrently with and be subject to the same gross rate, terms, conditions and endorsements as more particularly set forth in and, or may from time to time be added to Underwriters at Lloyd's, London Cover Note Number JHB 5127 [and JHB 5128] on the identical subject matter and risk."

Although these insurance companies are referred to by Land & Marine in its briefs here on appeal, and in some of its later pleadings below, as "London Companies," none of them were ever made defendants (or otherwise parties to the suit) by Land & Marine or by any other party below. Consequently, their liability to Land & Marine, if any, is not before this Court.

---

**3.** Under Cover Note JHB 5127, Lloyd's provided 45.10 percent of the excess coverage over the INA policy limits. Under Cover Note JHB 5128, Lloyd's provided 33.64 percent of the excess coverage over the INA and JHB 5127 policy limits. The remaining 54.90 percent of the excess coverage evidenced by Cover Note JHB 5127 was provided by the following companies:

| | |
|---|---|
| Orion Insurance Co., Ltd. | 17.02% |
| London & Overseas Insurance Co., Ltd. | 12.76% |
| English & American Insurance Co., Ltd. | 8.51% |
| Scottish Lion Insurance Co., Ltd. | 4.26% |
| Excess Insurance Co., Ltd. | 5.96% |
| Turegum Insurance Co. | 4.26% |
| London & Edinburgh Insurance Co., Ltd. | 2.13% |
| | 54.90% |

The remaining 66.36 percent of the excess coverage evidenced by Cover Note JHB 5128 was provided by the following companies:

| | |
|---|---|
| Orion Insurance Co., Ltd. | 16.59% |
| English & American Insurance Co., Ltd. and Economic Insurance Co., Ltd. | 14.22% |
| London & Overseas Insurance Co., Ltd. | 14.22% |

"I. COVERAGE

"Underwriters [Harbor] hereby agree, subject to the limitations, terms and conditions hereinafter mentioned, to indemnify the Assured [Land & Marine] for all sums which the Assured shall be obligated to pay by reason of the liability

"(a) imposed upon the Assured by law;

" . . . .

"for damages, direct or consequential and expenses, . . . on account of:

"(i) Personal Injury . . . [4]

" . . . .

"II. LIMIT OF LIABILITY

"Underwriters hereon shall only be liable for the Ultimate Net Loss the excess of either

"(a) the limits of the underlying insurances [INA and Lloyd's] . . . in respect of each occurrence covered by said underlying insurances;

"or (b) $25,000.00 Ultimate Net Loss in respect of each occurrence not covered by said underlying insurances, . . .

"and then only up to a further sum [of $1,000,000] . . . all in respect of each occurrence . . . ."

This policy also contained the following exclusion:

"D. SPECIAL CONDITIONS APPLICABLE TO OCCUPATIONAL DISEASE

"As regards personal injury (fatal or nonfatal) by occupational disease sustained by any employee of the Assured, this Insurance is subject to the same warranties, terms and conditions . . . as are contained in or as may be added to the Underlying Insurances prior to the happening of an occurrence for which claim is made hereunder."

On May 7, 1981, after hearing oral argument and considering the parties' briefs, the district court granted Lloyd's and Harbor's motion for summary judgment. The court held that the thirty-six-month exclusion provision of the INA policy was validly incorporated by reference into the excess policies, thereby rejecting Land & Marine's argument that such incorporation, which

the Louisiana Supreme Court's 1976 decision in *Spain v. Travelers Insurance Company,* 332 So.2d 827 (La.1976), had held violative of LSA–R.S. 22:628, was not validated by a subsequent 1976 legislative amendment of that statute "overruling" the *Spain* decision.

Thereafter, the district court rendered a final judgment, pursuant to Rule 54(b) for Lloyd's and Harbor. Subsequently, on September 24, 1981, the district court also rendered a final judgment, pursuant to Rule 54(b), for INA. Land & Marine has brought this appeal from those judgments.

II.

The parties concede that Louisiana law governs the construction and application of the INA policy. Under Louisiana law, insurers have the power, through unambiguous and clearly noticeable provisions, to limit their liability and to impose reasonable conditions upon their obligations, so long as the limitations and conditions imposed do not conflict with statutory law or public policy. *Stacy v. Petty,* 362 So.2d 810, 814 (La.App. 3d Cir.1978). In regard to exclusions, the Louisiana courts have held that an insurer has the duty to express clearly the exclusions to its insuring agreements, for exclusion provisions are strictly construed against the insurer, especially if they are of uncertain import. *Kendrick v. Mason,* 234 La. 271, 99 So.2d 108, 116 (1958); *Benton Casing Service, Inc. v. Avemco Insurance Co.,* 379 So.2d 225, 232 (La.1979); *Commercial Capital Systems, Inc. v. Paille,* 333 So.2d 293, 295 (La.App. 1st Cir.1976); *Bubrig v. Phoenix of Hartford Insurance Company,* 306 So.2d 60, 61 (La.App. 4th Cir.1974); *Hendrix Electric Company, Inc. v. Casualty Reciprocal Exchange,* 297 So.2d 470, 474 (La.App. 2d Cir. 1974). Hence, with these qualifications, insurers have, under Louisiana law, the same right as individuals to limit their liability and to impose whatever conditions they please upon their obligations. *Hall v. National Life & Accident Insurance Company,* 383 So.2d 74, 76 (La.App. 3d Cir.1980);

---

**4.** The Harbor policy denied personal injury to     mean, among other things, "disease."

*Franks v. Louisiana Health Services and Indemnity Company,* 382 So.2d 1064, 1067 (La.App. 2d Cir.1980).

## A. AMBIGUITY

Land & Marine contends that the INA policy is ambiguous regarding the nature of the coverage provided thereunder. Land & Marine argues that the insuring agreements, specifically Sections I and IV thereof, reasonably lead an insured to believe that the INA policy is an "occurrence" policy, a type of policy which provides indemnity if the otherwise covered injury or damage complained of occurs during the policy period, without regard to when the injury or damage manifests itself and is reported to the insurer; whereas, the thirty-six-month exclusion provision is of the type found in a "claims made" or "discovery" policy, which provides indemnity only if the otherwise covered injury or damage complained of is discovered, or is reported, within the policy period, regardless of when the injury or damage was sustained. *See Hunter v. Office of Health Services,* 385 So.2d 928, 936 n. 2 (La.App. 2d Cir.1980).

■ In making this argument, Land & Marine construes the insuring agreements and the thirty-six-month exclusion provision *separately* to infer an ambiguity. Under Louisiana law, however, "[t]he insurance contract is to be construed as a whole. Labels and headings given to the respective sections of the contract and the placement of the sections of the contract are pertinent to the inquiry of coverage, but one section or its placement is not to be construed separately and at the expense of disregarding other sections or placement." *Benton Casing Services, Inc. v. Avemco Insurance Co.,* 379 So.2d at 231. Thus, the insuring agreements, like the thirty-six-month exclu-

sion, must be read in the context of the entire policy, *Elledge v. Warren,* 263 So.2d 912, 914 (La.App. 3d Cir.), *writ denied,* 262 La. 1096, 266 So.2d 223 (1972), so as to give effect, if possible, to every part of the policy agreement. *Labbe v. Mt. Beacon Insurance Company,* 221 So.2d 354, 357 (La.App. 4th Cir.1965); *Brown v. Life and Casualty Insurance Company,* 146 So. 332, 334 (La. App. 2d Cir.1933).

■ Here, the INA policy clearly and unambiguously obligated INA to indemnify Land & Marine for damages resulting from bodily injury by disease, if (1) its employee's last exposure to the conditions causing the disease occurred during the policy period, *and* (2) the written claim for injury by disease was made, or suit thereon was brought, against the insured no later than thirty-six months after the end of the policy period.[5]

Construing the INA policy as a whole, we find no room for ambiguity concerning the coverage provided for bodily injury caused by disease. The language used to express the thirty-six-month exclusion is clear and precise. No esoteric significance is sought to be attached to any of it by INA. The placement of the exclusion provision within the policy is conspicuous. It appears in the main body of the policy, on the same page as the insuring agreements, under the heading (in large capital letters) "EXCLUSIONS."[6] We feel that the language of the pertinent insuring agreements and the thirty-six-month exclusion provision is such that an ordinary and intelligent businessman, reading these provisions together, could only conclude that he had coverage for an employee's otherwise covered bodily injury by disease if, but only if, a written claim or suit therefor was made or filed against him no later than thirty-six months after the end of the policy period, in this

---

**5.** Concerning bodily injury by *accident,* the policy provided coverage therefor if the accident occurred during the policy period. No conditions were imposed regarding the time when a claim for injury by accident must be made, or suit filed, against the insured.

**6.** Although Land & Marine, in its brief, asserts that INA made no attempt to explain the differ-

ence between a "claims made" policy and an "occurrence" policy, there is no summary judgment evidence that the officers or employees of Land & Marine were actually confused about the coverage provided under the INA policy, nor is there any such evidence or allegations that these officers or employees were the victims of accident, mistake, or fraud.

case on or before August 1, 1970. Given the clear language used, and the conspicuous placement of the exclusion, we think that any other conclusion would have been unreasonable and contrary to the manifest intent of the parties. *See Zurich Insurance Company v. Bouler,* 198 So.2d 129, 132 (La. App. 1st Cir.1967); *Johnson v. National Union Fire Insurance Co.,* 56 Misc.2d 983, 289 N.Y.S.2d 852, 855 (1968), *aff'd,* 33 A.D.2d 924, 309 N.Y.S.2d 110 (1970).

Where, as here, there is no ambiguity, the Louisiana courts have held that they "have no right or authority to write or make a new contract of insurance for the parties," *Green v. National Bellas Hess Life Insurance Company,* 124 So.2d 397 (La.App. 3d Cir.1960). The Louisiana courts have also held that they may not, to avoid hard consequences, import a nonexistent ambiguity into the insurance contract by forcing unusual or unnatural meanings from plain words. *Muse v. Metropolitan Life Ins. Co.,* 193 La. 605, 192 So. 72, 75 (1939); *Brown v. Life and Casualty Insurance Company,* 146 So. at 335. We hold, therefore, that the INA policy, being the law between the parties thereto, must be enforced as written, unless its provisions, though clear and unambiguous, are shown to be in conflict with the public policy or the statutory law of Louisiana, questions which we now consider.

## B. PUBLIC POLICY

■ "The principle that contracts in contravention of public policy are not enforceable should be applied with caution and only in cases plainly within the reasons on which that doctrine rests." *Twin City Pipeline Company v. Harding Glass Company,* 283 U.S. 353, 356–77, 51 S.Ct. 476, 477 (1931). That harsh consequences may occasionally result from the operation of a contract does not justify the courts in nullifying it on grounds of public policy. *Meinerz v. Treybig,* 245 So.2d 557, 559 (La.App. 3d Cir.), *writ ref'd,* 258 La. 580, 247 So.2d 395 (1971); *Cornellier v. American Casualty Co.,* 389 F.2d 641, 644 (2d Cir.1968). Construing an insurance contract accurately, and giving it the effect which its language clearly commands, is not, by that fact alone, a violation of public policy merely because it does not accord with the insured's expectations or desires. Appleman, *Insurance Law and Practice* § 7027; *Putnam v. New Amsterdam Casualty Company,* 48 Ill.2d 71, 269 N.E.2d 97, 104 (1970).

■ In a case such as this, the determination of whether an insurance policy is contrary to public policy is governed by the applicable state law, here Louisiana. *Twin City,* 283 U.S. at 357, 51 S.Ct. at 477–478 ("the constitution, law and judicial decisions of [the] State .... as well as the applicable principles of the common law are to be considered"); *Cornellier v. American Casualty Co.,* 389 F.2d at 643. In *McMillian v. Coating Specialists, Inc., supra,* a substantially identical exclusion provision to the one in the INA policy, was held by then District Judge Rubin not to violate the public policy of Louisiana. The exclusion provision there, like the one in the INA policy, provided that: "No coverage is provided where written claim is not made nor suit brought against the Insured within thirty-six (36) months after the end of the policy period."

Land & Marine, however, argues that it is against public policy to enforce the thirty-six-month exclusion provision without regard to when an employee discovers or should have discovered that he is suffering from an occupational illness. Here, however, the thirty-six-month exclusion provision, as discussed above, makes the INA policy, in regard to bodily injury by disease, have in this regard essentially the same effect as a "claims made" or "discovery" policy, which the Louisiana courts have repeatedly held does not violate public policy. *Oceanonics, Inc. v. Petroleum Distributing Company,* 292 So.2d 190, 192 (La.1974); *Livingston Parish School Board v. Fireman's Fund American Insurance Company,* 282 So.2d at 481–83. *See also Dee v. Republic Petroleum Corp.,* 413 So.2d 178, 179–80 (La. App. 4th Cir.1982) ("[t]here is no question that a liability insurance policy can exclude coverage for damages arising from an oc-

currence after the policy period, although the delictual act which gave rise to the occurrence took place during the policy period"); *Dement v. International Paper Company,* 363 So.2d 952, 954 (La.App. 3d Cir.1978) ("[a]ccording to the wording in the policy, it covered only 'claims brought during the certificate period.' This type of 'discovery' or 'claims made' policy has been held valid and not against public policy"); *Breaux v. St. Paul Fire & Marine Insurance Company,* 326 So.2d 891, 892–93 (La.App. 3d Cir.1976).[7]

Land & Marine also argues that the thirty-six-month exclusion provision violates public policy because it forces an insured to renew perpetually its coverage with the same insurer in order to be protected against a claim based on an otherwise covered occupational disease, which was contracted while the policy was in force, but which does not manifest itself, and thus is not asserted, until after the policy period, or the thirty-six-month extension period, has expired. Land & Marine asserts that the INA policy thus limits an insured's freedom of contract and is thereby contrary to public policy. However, assuming, as Land & Marine asserts, that Scarborough's claim against Land & Marine would have been covered had Land & Marine continued to renew the INA policy,[8] this "freedom of contract" argument has, nevertheless, been rejected by the Supreme Court of Louisiana in *Livingston Parish School Board v. Fireman's Fund American Insurance Company.*

There, an engineer was covered by a professional liability policy in effect from July 11, 1968 to July 11, 1969. During the policy period, the engineer negligently designed a building which collapsed, as a result of his negligent design, just three days after the policy period had expired. The insurer, Fireman's Fund, denied coverage, since the policy only extended to the engineer's negligent acts "if claim therefor is first made against the insured during this policy period." The policy, however, also afforded coverage for the engineer's negligent acts occurring before the present policy period (1) if the acts occurred while the engineer was covered by a policy issued by Fireman's Fund, and (2) if the engineer had maintained continuous coverage with Fireman's Fund since his negligent act had occurred. The engineer, however, had not renewed his policy, and he argued that the policy offended public policy because it impaired his freedom to contract.

In affirming the denial of coverage, the Supreme Court of Louisiana held that the policy, a "discovery" policy, did not violate public policy, and, relying on *Rotwein v. General Accident Group,* 103 N.J.Super. 406, 247 A.2d 370 (1968), also rejected the engineer's argument regarding the alleged impairment of his freedom to contract:

"(a) The freedom of contract contention is that the policy tied the policyholder into perpetual renewal of coverage with the insurer, in order to obtain adequate and continued protection for risks occurring during the policy year for which he had [bought] protection. However, the [*Rotwein*] court held that, in an absence of a showing of no options of obtaining reasonable continuing coverage from the same or other insurers, or of a

**7.** Nor have we found any Louisiana decisions which have held that a policy, which clearly and unambiguously applies the features of a "claims made" policy to certain types of covered claims, and the features of an "occurrence" policy to other types of covered claims, violates public policy. *See Brander v. Nabors,* 579 F.2d 888, 890 (5th Cir.1978) ("Mississippi law does not ... require insurers to restrict professional liability policies to one of two rigid molds").

**8.** Our attention has not been directed to any provision or endorsement of the INA policy in question which expressly and on its face purports to provide coverage for a claim of bodily injury by disease not reported within thirty-six months of the policy period in effect when the last exposure to the disease-producing conditions occurred. In other words, the parties have not cited us to any provision in the INA policy that expressly relates the coverage provided thereunder back to previous INA policy periods. However, for the purposes of this opinion, we assume the correctness of Land & Marine's assertion (which INA has not disputed) that continuous protection against acts or omissions committed in prior policy periods would have been provided had it continued to renew its policy with INA.

showing that the choices available to the plaintiff were unreasonably restrictive or expensive because of the present insurance contract, the policy did not have any inherent tendency to limit the policyholder's freedom of contract . . . .

" . . . .

"For similar reasons, we reject the contention that the present clauses are invalid as contrary to public policy. . . .

" . . . .

"The variety of coverage obtainable (presumably with premiums calculated in accordance with the amount of protection assured) reinforces our conclusion, whereby we uphold the validity of the present policy provision insofar as it limits coverage to claims discovered and reported during the policy period. If the insured did not wish to renew coverage with [the insurer] under the present policy, he was not, by reason of any provision of the present policy, deprived of a reasonable opportunity to obtain protection from [the same insurer] or other insurers by the various other types of coverage available." 282 So.2d at 482–83.

Here, like the engineer in *Livingston,* Land & Marine has made no showing that it was unable to obtain reasonable continuing protection against claims of bodily injury by disease, arising out of wrongful acts committed during prior policy periods, from other insurers.

We hold, therefore, that the thirty-six-month exclusion provision of the INA policy does not violate the public policy of Louisiana, as is plainly demonstrated by the Louisiana jurisprudence.

## C. CONFLICT WITH STATUTORY LAW

■ In a post-submission brief, Land & Marine contends that the thirty-six-month exclusion provision of the INA policy conflicts with LSA–R.S. 22:629, which provides, in part, as follows:

"A. No insurance contract delivered or issued for delivery in this state and covering subjects located, resident, or to be performed in this state, shall contain any condition, stipulation, or agreement:

" . . . .

"(3) Limiting *right of action against the insurer* to a period of less than one year from the time when the cause of action accrues in connection with all insurances unless otherwise specifically provided in this Code.

"B. Any such condition, stipulation, or agreement in violation of this Section shall be void, but such voiding shall not affect the validity of the other provisions of the contract." (Emphasis added.)

Appellees argue that the thirty-six-month exclusion provision is not within the scope of this statute. We agree.

Although neither the parties nor we have found any decisions expressly considering the reach of LSA–R.S. 22:629 A(3), the language of the statute itself adequately demonstrates that it is concerned only with provisions limiting the "right of action against the insurer." The language of the thirty-six-month exclusion provision, on the contrary, places no time limit on the right of the insured, or of an injured party through a direct action under LSA–R.S. 22:655, to bring suit against the insurer, INA, to enforce an alleged covered liability, or to determine whether coverage exists. Rather, the exclusion provision defines the *duration of the covered risks* provided by the policy. There is nothing in LSA–R.S. 22:629 A(3) which limits the right of the insurer to define, and place limitations upon, the duration of the coverage afforded by its policy. Instead, the statute limits the right of an insurer to reduce the time period within which the insured (or the injured party) can bring suit against the insurer.

That the thirty-six-month exclusion provision, and other provisions in other policies containing similar limitations on the duration of the coverage, have not been construed to place time limits on the "right of action" against the insurer, is implicit in the decisions of the Louisiana appellate courts in *Livingston, Oceanonics, Dee, Dement,* and *Breaux.* The provisions contained in LSA–R.S. 22:629 A(3) have been a part of the Louisiana statutory law since 1948, well

prior to any of the relevant operative facts in each of the foregoing decisions. The INA policy contains no time limit on the right of Land & Marine to bring suit against it, nor has INA urged here or below that Land & Marine's suit was time barred. Instead, INA has consistently argued that the liability sought to be enforced against it was not covered by its policy. We hold that the thirty-six-month exclusion provision of the INA policy is not within the scope of, and thus is not in conflict with, LSA–R.S. 22:629 A(3).

Having held that the thirty-six-month exclusion provision of the INA policy is valid and enforceable against Land & Marine, we now consider whether it was validly incorporated by reference into the excess policies issued to Land & Marine by Lloyd's and Harbor.[9]

### III.

■ When Lloyd's and Harbor's excess policies were issued to Land & Marine in 1966, LSA–R.S. 22:628 provided that:

"No agreement in conflict with, modifying, or extending the coverage of any contract of insurance shall be valid unless in writing and made a part of the policy."

The record shows that, before 1976, incorporation by reference of the terms, conditions, and exclusions of the underlying primary policies into excess policies was considered valid and not in conflict with LSA–R.S. 22:628. *See Froust v. Coating Specialists, Inc.,* 364 F.Supp. 1154, 1155–56 (E.D.La. 1973), *aff'd per curiam,* 494 F.2d 1352 (5th Cir.1974) *cert. denied,* 419 U.S. 1070, 95 S.Ct. 657, 42 L.Ed.2d 666 (1974); *The Work*

*of the Louisiana Appellate Courts for the 1975–76 Term,* 37 La.L.Rev. 305, 494 (1977).

In 1976, however, after the primary and excess policies herein had expired, the Supreme Court of Louisiana, in *Spain v. Travelers Insurance Company, supra,* construed LSA–R.S. 22:628 to nullify the incorporation by reference of an exclusion provision, contained in an underlying primary policy, into an excess policy, by holding that an excess carrier could not rely on an exclusion in a primary policy unless the exclusion were, in some manner, "physically made a part of" the excess policy.[10] 332 So.2d at 833.

The Supreme Court rendered its decision in *Spain* on May 17, 1976, and denied rehearing on June 18, 1976. In late June 1976, Senate Bill 797 was introduced as emergency legislation[11] in the Louisiana Legislature to amend and reenact LSA–R.S. 22:628 to provide, "with respect to the form of agreements modifying or extending contracts of insurance," "exceptions thereto." The record contains a report of the minutes of a June 30, 1976 meeting of the Louisiana Senate Committee on Commerce considering Senate Bill 797. This report provides, in part, as follows:

"This Bill would additionally provide that the above provisions [of section 22:628] shall not apply to contracts of reinsurance, warranties and/or excess liability insurance which incorporate by specific reference the limitations and provisions of the primary insurance contract.

"Mr. George R. Blue, attorney for the Louisiana Surplus Lines Association, spoke in support of the Bill and stated

---

**9.** We also note that the Lloyd's policies, according to the cover notes, provided that Lloyd's would be liable "only after the Primary Insurers have paid or have been held liable to pay the full amount of their respective ultimate net loss liability ...." In *McMillian,* Judge Rubin relied on an identical provision to hold that since there was no basis for liability of the primary insurers, the excess insurers could not be held liable. 427 F.Supp. at 56.

**10.** The Supreme Court stated:
"For example, an instrument may be attached by affixing a photocopy of it to the

[excess] policy, or it may be imprinted upon the policy itself through typing, handwriting or other methods. In each case, however, it is clear that the essence of the [underlying provision relied on] must physically become a part of the [excess] policy in order to have any validity." 332 So.2d at 831.

**11.** In Louisiana, enactments passed as emergency legislation may become effective upon signature by the governor, rather than at the normal sixty days after legislative adjournment.

that this Bill was introduced recently by special resolution to rectify a problem created by a decision of the Supreme Court in *Spain* and *Broussard v. Travelers.*

"This Bill amends [section 22:628] and provides an exception as to excess warranties and this type of reinsurance contract wherein they can be incorporated together and given full legal effect."

Bill 797 was subsequently passed by the Legislature as Act 150, and signed into law by the Governor of Louisiana on July 20, 1976. The amended Act provided that:

"The provisions of this Section shall apply where primary and/or underlying insurance contracts are coupled by reference with contracts of reinsurance, warranties and/or excess liability contracts which are in existence as of the effective date hereof [July 20, 1976]."

Land & Marine opposed Lloyd's and Harbor's motion for summary judgment in the district court on the ground that this amendment did not apply to the Lloyd's and the Harbor excess policies. The district court, however, in holding that the thirty-six-month exclusion provision of the INA policy was validly incorporated by reference into the excess policies, held that:

"The clear intention of the legislature in [enacting the 1976 amendment to section 22:628] ... was to validate all those policies in existence which would otherwise fall within the scope of the Court's ruling in *Spain*. Had the legislature intended a purely prospective result it would not have chosen to specifically apply the amendment to policies 'in existence', but would have used other words, such as 'in effect on the effective date of this enactment,' or 'entered into subsequent to or on the effective date of the enactment.' Amendments after 1976 to LSA–R.S. 22:628 have not served to alter the effect of this statute as it applies to

this policy and have continued to use the phrase 'in existence' in defining which policies the amendments apply."

Land & Marine does not dispute Lloyd's and Harbor's assertion that LSA–R.S. 22:628 was amended to overrule the holding in *Spain*. It does, however, contend that the amendment does not apply to the excess policies herein for several reasons.

Land & Marine's initial argument is that the excess policies were not "in existence" when the amendment became effective on July 20, 1976, since the policy periods had expired by that time. Instead, Land & Marine asserts that only a right of indemnification from Lloyd's and Harbor existed in 1976. We disagree.

Clearly, the insurance policies issued to Land & Marine by Lloyd's and Harbor were in existence in 1976, even though the policy periods contained therein had already expired. It strikes us as inconsistent for Land & Marine to urge that the excess policies issued to it were not "in existence," when its cross-action against Lloyd's and Harbor was based on the coverage allegedly provided thereunder. The right of indemnification sought to be enforced against Lloyd's and Harbor does not exist independently of its policies.

That the 1976 amendment to LSA–R.S. 22:628 was intended to apply retroactively to excess policies executed before the effective date thereof, so that those policies could be enforced as written, plainly appears from the language, nature, and cause of the amendment.[12] Moreover, we hold that the 1976 amendment was a curative statute, intended by the Louisiana Legislature to overrule the decision in *Spain* and to permit the enforcement of existing excess policies as written and in accordance with the original, lawful intention of the parties thereto.[13]

---

**12.** That the Louisiana Legislature's primary intent was that the 1976 amendment apply retroactively to existing excess policies is further evidenced by the fact that excess insurers, reacting to the *Spain* decision, would simply have drafted their new excess policies to satisfy the

construction placed on LSA–R.S. 22:628 by the Supreme Court.

**13.** Article 8, LSA–C.C., sets forth the general rule on retroactivity of statutes passed by the Louisiana Legislature: "A law can prescribe

However, a statute, though it operates retroactively, will not be given that effect if it would impair the obligations of contracts or disturb a party's vested rights. *Succession of Lambert*, 210 La. 636, 28 So.2d 1, 9 (1946). Land & Marine argues that retroactive application of the 1976 amendment disturbs its "vested right" of indemnification from Lloyd's and Harbor. However, we reject Land & Marine's assertion that it was possessed of any such "vested right" or that the 1976 amendment, if applied retroactively to this case, would "impair the obligations of contract."

In *McNair v. Knott*, 302 U.S. 369, 58 S.Ct. 245, 82 L.Ed. 307 (1937), the Supreme Court of the United States held that no vested right was infringed by a federal statute which validated existing pledges given by national banks as security for deposits of public funds. In response to the contention that the pledge contracts could not be validated by changing the law which was enforced when they were made, the Supreme Court held:

"There is nothing novel or extraordinary in the passage of laws by the Federal Government and the States ratifying, confirming, validating, or curing defective contracts. Such statutes, usually designated as 'remedial,' 'curative,' or 'enabling,' merely remove legal obstacles and permit parties to carry out their contracts according to their own desires and intentions. Such statutes have validated transactions that were previously illegal relating to mortgages, deeds, bonds, and other contracts. Placing the stamp of legality on a contract voluntarily and fairly entered into by parties for their mutual advantage takes nothing away from either of them. No party who has made an illegal contract has a right to insist that it remain permanently illegal. Public policy cannot be made static by those who, for reasons of their own, make contracts beyond their legal powers. No person has a vested right to be permitted to evade contracts which he has illegally made." 302 U.S. at 372–73, 58 S.Ct. at 247 (footnotes omitted).[14]

Here, when the excess policies were issued to Land & Marine in 1966, the parties thereto reasonably and in good faith understood and expected that the incorporations by reference of the terms and conditions of

only for the future; it can have no retrospective operation, nor can it impair the obligation of contracts." *See also* LSA–R.S. 1:2 ("No Section of the Revised Statutes is retroactive unless it is expressly so stated"). An exception to this general rule of nonretroactivity is a curative statute. *Fullilove v. U.S. Casualty Co. of N.Y.*, 129 So.2d 816 (La.App. 2d Cir.1961); *Breazeale v. CNA Insurance*, 417 So.2d 27, 28 (La.App. 1st Cir.1982); *Green v. Liberty Mutual Insurance Co.*, 352 So.2d 366, 368 (La.App. 4th Cir.1977), *writ denied*, 354 So.2d 210 (La. 1978). In *Fullilove*, curative statutes were defined as those which

"... by their very nature, are intended to enable persons to carry into effect that which they have designed and intended, but which have failed of their expected legal consequences by reason of some statutory disability or irregularity in their action. Such acts are, by their very nature, intended to operate on past transactions, and are necessarily retrospective. Curative statutes, by reason of their remedial and retrospective nature, are to be liberally construed to correct the mischief or advance the remedy intended, and are applicable not only to past transactions but also to pending cases, either in the trial court or on appeal." 129 So.2d at 824.

*See Page v. American Motorist Ins. Co., Ltd.*, 381 So.2d 889, 890 (La.App. 2d Cir.1980) (amendment to LSA–R.S. 22:1406 providing that the document, in which an insured rejects uninsured motorist coverage, does not have to be physically attached to the policy, held to be "in the nature of remedial or curative legislation, which is applied retroactively"); *In re Caldwell Port Elevator, Inc.*, 23 B.R. 154, 156 (Bkrtcy.W.D.La.1982) (amendment to Louisiana statute dispensing with previous requirement that chattel mortgage recite location of chattel, held to be a curative statute thus applying to chattel mortgage executed before the passage of the amendment). *See also Lombard v. Manchester Life Ins. Co.*, 406 So.2d 742, 744 (La.App. 4th Cir.1981), *writ denied*, 410 So.2d 764 (La.1982).

**14.** *See also Ewell v. Daggs*, 108 U.S. 143, 151, 2 S.Ct. 408, 414, (1883) ("The right which the curative or repealing Act [which repealed usury laws in effect when the usurious contract was made] takes away in such a case is the right in the party to avoid his contract, a naked legal right which it is usually unjust to insist upon, and which no constitutional provision was ever designed to protect").

the INA policy into the excess policies were valid and binding, and that the excess policies were therefore subject to the same terms and conditions as was the INA policy, and that the coverage afforded by the excess policies would only be available if the claim against Land & Marine exceeded the INA policy limits. Ten years later, however, the Supreme Court of Louisiana, in *Spain,* for the first time construed LSA–R.S. 22:628 so as to give Land & Marine coverage that it did not bargain for, or rely upon, and which neither it nor the excess insurers intended it to have or thought it had, by, in effect, nullifying the use of incorporation by reference. The subsequent amendment to LSA–R.S. 22:628 restored the validity of incorporation by reference and thus gave effect to the *original* intention of the parties by placing Land & Marine, Lloyd's, and Harbor in the same positions they occupied when the excess policies were issued.[15] We hold that no vested right of Land & Marine is infringed by the application of the 1976 amendment to the excess policies issued to it by Lloyd's and Harbor, and that no obligations of contract are impaired thereby. The incorporations by reference of the thirty-six-month exclusion provision into the excess policies are therefore valid and binding.

### IV.

Because the thirty-six-month exclusion provision of the INA policy is valid and enforceable under Louisiana law, and since its inclusion into the excess policies of Lloyd's and Harbor through incorporation by reference is also valid and binding, we therefore affirm the district court's judgment.

AFFIRMED.

15. We further note that Land & Marine's cause of action, if any, for indemnification from Lloyd's and Harbor did not arise until after the 1976 amendment had been passed. Thus, at the time Land & Marine's cause of action arose, the incorporation by reference had been validated and, as discussed in the text, no expectation of, bargained for or relied on coverage had

been taken away by the amendment. Land & Marine's reliance on *Talluto v. Patchen,* 370 So.2d 618 (La.App. 4th Cir.1979), is misplaced. There, the plaintiff's cause of action arose before the effective date of the amendment in issue, and was held inapplicable to bar the plaintiff's suit.